IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

**SIMMONS FOOD, INC.**                                                                    **PLAINTIFF**

v.                          Case No. 5:13-CV-05204

**INDUSTRIAL RISK INSURERS, AN
UNINCORPORATED FOR PROFIT
ASSOCIATION; SWISS REINSURANCE
AMERICA CORPORATION; WESTPORT
INSURANCE COMPANY; and IRONSHORE
SPECIALTY INSURANCE COMPANY**                                         **DEFENDANTS**

**OPINION AND ORDER**

Currently before the Court are Plaintiff Simmons Food, Inc.'s ("Simmons") Motion for Sanctions and Brief in Support (Doc. 130); Defendants Industrial Risk Insurers ("IRI"), Swiss Reinsurance America Corporation, Westport Insurance Company, and Ironshore Specialty Insurance Company's ("Ironshore") Response in Opposition (Doc. 132); Simmons' Reply (Doc. 142); and Defendants' Sur-Reply (Doc. 147).  Simmons states that Defendants and their counsel engaged in the destruction and cover-up of certain evidence in anticipation of Simmons filing this suit and before Simmons had the opportunity to view the evidence. For the reasons stated below, Simmons' Motion (Doc. 130) is **DENIED**.

Also before the Court is Simmons' Motion for Leave to File First Amended Complaint (Doc. 131).  The proposed amended complaint would, first, correct the name of one of the Defendants, Westport Insurance Company—the entity's true name being Westport Insurance Corporation.  Second, the proposed amended complaint would add a new cause of action against Defendants for bad faith, predicated on the underlying facts asserted in support of the Motion for Sanctions, namely, that Defendants destroyed certain

evidence and intended to engage in dishonest behavior to avoid paying Simmons' legitimate claims. For the reasons stated below, Simmons' Motion for Leave (Doc. 131) is **DENIED**, except that the name of Defendant Westport Insurance Company will be amended in the docket and on all future pleadings to reflect that entity's true legal name, Westport Insurance Corporation.[1]

This case is about a disagreement between insured and insurers over the proper measure of damages to be paid pursuant to a policy of insurance. Simmons' insurance policy covers its manufacturing facility, a prefabricated, rectangular metal structure located in Fort Gibson, Oklahoma ("the Facility"). The Facility was damaged during two snowstorms that occurred in February 2011 when the roof collapsed in the center. Simmons' insurance policies held with Separate Defendants IRI and Ironshore contained a Replacement Coverage Endorsement, which provided that liability "shall not exceed the smaller of the following: (1) the cost to repair, rebuild or replace on the same site with new materials of like kind and quality, whichever is the smallest; [or] (2) the actual expenditure incurred in repairing, rebuilding or replacing on the same or another site, whichever is the smallest." (Doc. 1-1, p. 79).

Defendants collectively made two payments to Simmons, one for $2,708,615.45 and another for $1,170,482.54, which Defendants believed to be sufficient to cover the total reasonable cost to repair the damage to the Facility. Simmons, on the other hand, believed the condition of the Facility was such that it could not be repaired, as it no longer

---

[1] In their response in opposition to the Motion for Leave to File First Amended Complaint, Defendants did not oppose Simmons' request to amend Defendant Westport Insurance Company's name.

met building code requirements, and instead required rebuilding. Simmons ultimately built a new Facility at a cost of $7,367.859.12. Defendants contend that building the new Facility was unnecessary.

Turning to the Motion for Sanctions now before the Court, Simmons alleges that Defendants destroyed a computer model created by one of Defendants' engineering experts for the purpose of debunking the opinion of Simmons' engineering expert. Defendants retained engineering firm Rimkus Consulting Group ("Rimkus") after Simmons filed its claim of loss. The lead engineer from Rimkus was William Mazur, who has been listed as a retained, testifying expert for trial. In March of 2011, Mr. Mazur issued a report to Defendants, opining that $2,708,615.45 was the reasonable cost to repair the Facility. Simmons retained its own expert, engineer Daniel Ryan, who issued reports in April and July of 2011, opining that the only feasible option for Simmons, given the extent of the damage to the Facility, was a total rebuild.

This dispute over whether the Facility should have been repaired or rebuilt continued for approximately the next two years. Simmons freely admits—and, indeed, makes a point of claiming in its Motion for Sanctions—that during this time, the case transformed from a claims reimbursement process to an adversarial dispute in which litigation was anticipated. Simmons asserts that "[a]s early as March, 2013, when the dispute had some age on it" and Defendants were expecting either a demand for an appraisal or a lawsuit from Simmons "any day," Defendants' agent directed the engineering expert, Mr. Mazur, to create a computer model of the damaged Facility. (Docs. 130, p. 4; 142, p. 2). Mr. Mazur delegated this task to Johnn Kreuser, another engineer employed by Rimkus.

According to Simmons, over the next few months Mr. Kreuser created a viable computer model of the damaged Facility, which he ultimately deleted and destroyed. Simmons contends that Mr. Kreuser actually created a model of the Facility (or at least attempted to) in his capacity as one of Defendants' retained experts, in anticipation of imminent litigation, and with the full knowledge that Simmons was planning to either demand appraisal or file a lawsuit "any day."

The parties disagree about whether the model was completed at all, or if it was completed, whether it was usable or functional. The parties further disagree about whether Defendants relied upon the model in the claim adjustment process. Simmons believes that the model was at some point viable, and, further, that Mr. Kreuser intentionally destroyed the model because its results contradicted (or at a minimum were not helpful) to Defendants' position in this case. Although Simmons cites some emails and deposition testimony to support its position, the evidence cited by Defendants is both more voluminous and more persuasive. Defendants point to Mr. Kreuser's sworn testimony, in which he clearly stated multiple times that he was unable to get the computer program to accurately depict the two discrete parts of the building, much less what may have happened during the collapse; that his attempt to create a model was a failure; and what resulted from his efforts to create the model was a "squiggly mess on a computer screen." (Doc. 132-10, p. 26). He further averred under oath that because the program did not work and would not generate a viable model, he did not consult with Defendants before deleting it, and it was his sole decision to delete it. *See* Mr. Kreuser's Deposition Transcript, Doc. 142-8, p. 18 ("Q: Before deleting the computer file, did you contact anybody in the whole

world, including Mr. Egan, Mr. Kelly, Mr. Green, Mr. Mazur, the lawyers at ClineCo, and ask them, 'Hey, is it okay for me to go ahead and delete this computer file'?  A: No, sir.").

Several of Defendants' representatives, including adjuster John Green and claims representatives Chris Kelly and Ken Eagen, testified that they did not see, receive, or know of the existence of a completed model created by Mr. Kreuser.  They all testified that Defendants did not rely on a model created by Mr. Kreuser in determining whether or not to reimburse Simmons for rebuilding the Facility.  In reviewing the depositions attached and/or incorporated in the Motion, Response, Reply, and Sur-Reply, there is no persuasive evidence to indicate that Mr. Kreuser was able to generate a viable model that was used or relied on in some capacity by Defendants.

Moreover, Simmons' position is couched in the mistaken premise that "evidence" has been destroyed.  It cites to *Dillon v. Nissan Motor Co.*, 986 F.2d 263 (8th Cir. 1993) (destruction of a vehicle that was the subject of a products liability lawsuit); *Harrison v. Union Pac. R.R. Co.*, 2002 U.S. Dist. LEXIS 29004 (E.D. Ark. Nov. 19, 2002) (destruction of audio recordings of train crew following a railroad accident); *Stevenson v. Union Pac. R.R.*, 354 F.3d 739 (8th Cir. 2004) (destruction of train audio and track maintenance records following an accident); and *Menz v. New Holland N. Am., Inc.*, 440 F.3d 1002 (8th Cir. 2006) (tampering with a tractor that was the subject of a products liability lawsuit), to support its position.  However, all of these cases pertain to tangible items that were in existence during the commission of a tort and were subsequently tampered with or destroyed.  By contrast, Mr. Kreuser's deleted model is not "evidence" in that sense, but rather the work product of an expert retained in anticipation of litigation.

Although the parties have not briefed this issue, the Court questions whether the deleted model—regardless of its viability—would have been discoverable evidence in the first place. Even if the Court were to assume the facts exactly as Simmons pleaded in its Motion for Sanctions, the model would seemingly qualify as expert work product, which is protected from discovery by privilege under Fed. R. Civ. P. 26(b)(3)(A) and (b)(4).

Rule 26(b)(3)(A) states:

Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4) [regarding experts], those materials may be discovered if:

(i) they are otherwise discoverable under Rule 26(b)(1); and
(ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

Rule 26(b)(4)(B) provides that draft reports or disclosures made by retained experts are protected by work-product privilege.

Here, there has been no showing that the model prepared by Mr. Kreuser was relied upon in forming a final expert report or opinion, as the model was, at best, a discarded draft. Next, the model was either prepared or attempted by Defendants' retained expert in anticipation of imminent litigation, specifically for the purpose of refuting the opinions of Simmons' expert. Finally, if the model existed and were otherwise deemed discoverable under Rule 26(b)(3)(A)(i), production would have only been required upon Simmons' showing of (1) "substantial need" and (2) that it "cannot, without undue hardship, obtain [its] substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). So even though the privilege issue has not been briefed, the Court concludes that Simmons could

6

not be prejudiced by the deletion of the expert's model—functional or not—because it is undisputed that all of the data Mr. Kreuser used to attempt to create the model is in Simmons' possession and was disclosed in discovery. It follows that if Simmons wished to use that data to recreate its own model, it could certainly do so.[2]

Considering that the Court has now determined Simmons' Motion for Sanctions should be denied, there is no valid basis for amending the Complaint to assert a cause of action for bad faith. The proposed amended complaint states in support of a claim for bad faith that "Defendants destroyed crucial evidence that did not support their position, failed to properly investigate Simmons' claim, and never intended to negotiate in good faith with Simmons." (Doc. 131-1, p. 9). Several subsequent paragraphs of the proposed amended complaint are devoted to explaining why Simmons believes Defendants acted in bad faith, and all such paragraphs concern Mr. Kreuser's deleted model, which Defendants speculate "*had been prepared* and was later *intentionally destroyed*." *Id.* at p. 10 (emphasis in original).

At this late stage in the litigation—after discovery has closed, close to a year after the deadline to amend pleadings has passed, and after all depositions have been taken and the salient facts in this case are known—no good cause exists to permit amending the Complaint, especially considering that the new predicate allegations rise only to the level of speculation, and, by contrast, the overwhelming deposition testimony of all material defense witnesses demonstrates that no material facts exist to support a claim of bad faith.

---

[2] With all of that said, the Court is willing to revisit this issue if any of Defendants' experts testify at trial that they reviewed or relied upon Mr. Kreuser's deleted model in forming their opinions. Otherwise, unless a proper foundation is established, the Court orders that neither party mention anything about the deleted model during the trial of this matter.

The tort of bad faith in the insurance context requires a showing of "dishonest, malicious, or oppressive conduct . . . carried out with a state of mind characterized by hatred, ill will, or a spirit of revenge." *Richison v. Boatmen's Ark., Inc.*, 64 Ark. App. 271, 275 (Ark. Ct. App. 1998). It is not bad faith to refuse to reimburse an insured for the cost of repair or construction work if the basis of that refusal is the insurer's disagreement that such costs are justified under the policy of insurance. It is also not bad faith for an insurance company's expert to perform a negligent investigation of a claim. The tort of bad faith requires hatred, ill will, or a spirit of revenge—not mere negligence; and all the facts in the proposed amended complaint concerning Mr. Mazur's investigation of the damaged Facility indicate, at most, negligence. Finally, the facts alleged in the proposed amended complaint concerning the intentional concealment and destruction of Mr. Kreuser's model cannot support a claim for bad faith considering the weight of the deposition testimony to the contrary by Messrs. Kreuser, Egan, Kelly, Green, and Mazur. Simmons speculates that the model is a smoking gun, indicating Defendants' bad faith, but nothing but speculation supports this allegation.

Leave to amend should be denied "if the proposed amended pleading would be futile," *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 871 (8th Cir. 2002). In general "when the court denies leave on the basis of futility, it means the district court has reached the legal conclusion that the amended complaint could not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure . . . ." *Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008). Here, it is the Court's determination that the claim of bad faith stated in the proposed amended complaint would

not survive a motion for summary judgment, let alone a motion to dismiss for failure to state a claim.

## IV. CONCLUSION

Based on the foregoing, **IT IS ORDERED** that Simmons' Motion for Sanctions (Doc. 130) is **DENIED**.

**IT IS FURTHER ORDERED** that Simmons' Motion for Leave to File First Amended Complaint (Doc. 131) is also **DENIED**; however, the name of Defendant Westport Insurance Company will be **AMENDED** in the docket of this case and on all future pleadings to reflect the correct name of that entity, Westport Insurance Corporation. The Clerk of Court is therefore **DIRECTED** to amend the name of this party on the docket. There is no need for Simmons to file an amended complaint to reflect this change.

**IT IS SO ORDERED** this 25th day of September, 2015.

/s/ Timothy L. Brooks
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE